## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK W. RAMSEY, JR., and ILLONA A. RAMSEY, | : : : | CIVIL ACTION NO. 1:16-CV-1879 |
| Plaintiffs | : : | (Judge Conner) |
| v. | : : | |
| BUCHANAN AUTO PARK, INC., | : : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Frank A. Ramsey, Jr. ("Ramsey"), and his wife, Illona A. Ramsey, commenced this civil action asserting negligence and other claims against various defendants under Pennsylvania law.  The claims arise from Ramsey's allegation that he suffered a workplace injury while making a delivery to defendant Buchanan Auto Park, Inc. ("Buchanan").  The case proceeded to trial against Buchanan alone on a premises-liability theory.  The jury returned a verdict for plaintiffs in the aggregate amount of $520,979.81.  Both parties have filed post-trial motions.

## I.    Factual Background & Procedural History[1]

The testimony at trial generally established Ramsey was injured while delivering auto parts to Buchanan's premises in September 2014.  At the time, Ramsey was employed by and working as a delivery truck driver for TransForce.

---

[1] The parties and the court are intimately familiar with the factual background of this case following Rule 56 motion practice and three days of evidence during the jury trial.  Accordingly, we provide only a brief summary of the factual background here, which we supplement as necessary in the analysis that follows.

Delivering parts to Buchanan's facility required Ramsey to utilize a wheeled cage to transport the items from his truck and into the facility.  On the day in question, Ramsey was pushing the cage across the parking lot and toward the garage when the cage became lodged in what the parties have referred to as a depression, ditch, or hole.[2]  Ramsey injured his right wrist as he tried to stop the cage from tipping over.

Ramsey commenced this lawsuit, together with his wife, asserting claims against Buchanan as well as defendant FCA US LLC, formerly known as Chrysler Group LLC, which allegedly owned the cage.  We entered summary judgment on the claims against FCA US LLC and the case proceeded to trial against Buchanan on two claims: Ramsey's negligence claim, and his wife's loss-of-consortium claim.  After three days of evidence, the jury returned a verdict for Ramsey as follows: $436,120.67 for past and future wage loss; $34,859.14 for past medical expenses; and $50,000 for past, present, and future pain and suffering, embarrassment and humiliation, loss of enjoyment of life, and disfigurement.  The jury awarded $0 to Ramsey's wife for loss of consortium.  Plaintiffs and Buchanan have each filed post-trial motions.  The motions are fully briefed and ripe for disposition.

---

[2] For purposes of consistency, the court will refer to the alleged defect as a "depression" throughout this memorandum.

II.   **Legal Standards**

A.   **Rule 50(b)**

Federal Rule of Civil Procedure 50(b) authorizes a district court, after a jury trial, to order a new trial or enter judgment as a matter of law.  See FED. R. CIV. P. 50(b)(2)-(3).  In considering a motion for judgment as a matter of law or for a new trial under Rule 50(b), the court must view the evidence in the light most favorable to the nonmovant, "giving it the advantage of every fair and reasonable inference," to determine whether there was "insufficient evidence" from which the jury could find in the nonmovant's favor.  See Kars 4 Kids Inc. v. America Can!, 8 F.4th 209, 218 n.8 (3d Cir. 2021) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).  The relevant inquiry "is not whether there is literally no evidence" favoring the nonmovant, "but whether there is evidence upon which the jury could properly find a verdict for that party."  Id. (quoting Jaasma v. Shell Oil Co., 412 F.3d 501, 503 (3d Cir. 2005)).  A district court conducting this inquiry must take care not to reweigh the evidence, assess witness credibility, "or substitute its version of the facts for the jury's version."  See id. (quoting Lightning Lube, 4 F.3d at 1166).

B.   **Rule 59(a)**

Federal Rule of Civil Procedure 59(a) similarly authorizes a district court, following a jury trial, to grant a new trial on some or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." See FED. R. CIV. P. 59(a).  Such reasons include instructional or evidentiary errors, excessive damages awards, or verdicts that are against the weight of the evidence. See Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940); 11 CHARLES ALAN

WRIGHT & ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 2805 (3d ed. 2021).  A court should grant a Rule 59(a) motion for a new trial on weight-of-the-evidence grounds only when the evidence so "cuts against the verdict" that "a miscarriage of justice would result if the verdict were to stand."  See Leonard v. Stemtech Int'l Inc, 834 F.3d 376, 386 (3d Cir. 2016) (quoting Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006)).  Although the court need not view the evidence in the light most favorable to the nonmovant, see Marra v. Phila. Hous. Auth., 497 F.3d 286, 309 n.18 (3d Cir. 2007), the court must not "substitute its judgment of the facts and the credibility of the witnesses for that of the jury," see Leonard, 834 F.3d at 386 (quoting Delli Santi v. CAN Ins. Cos., 88 F.3d 192, 201 (3d Cir. 1996)).  The court may limit its grant of a new trial to only a portion of the issues litigated in the initial trial, including the issue of damages only.  Vizzini v. Ford Motor Co., 569 F.2d 754, 759 (3d Cir. 1977).  The decision to grant a new trial is committed to the sound discretion of the district court.  See Leonard, 834 F.3d at 386; Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991).

## C.    Rule 59(e)

Federal Rule of Civil Procedure 59(e) permits a court to alter or amend a judgment.  See FED. R. CIV. P. 59(e).  A Rule 59(e) motion must rely on at least one of the following three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice."  See Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (quoting Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)); see Max's Seafood Café

v. Quinteros, 176 F.3d 669, 677-78 (3d Cir. 1999); Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985).[3]

## III.   Discussion

Buchanan raises challenges to the court's evidentiary rulings and jury instructions as well as to the jury's verdict, both as to liability and its award of damages for wage loss and medical expenses.  Ramsey also moves the court for post-trial relief, seeking a new trial as to the jury's pain-and-suffering award as well as delay damages.[4]  We begin our analysis with Buchanan's evidentiary argument.

### A.   Photographs

Buchanan first argues the court improperly admitted photographs of the incident scene taken at a deposition in 2017 because the photographs did not accurately depict the asphalt depression that allegedly caused Ramsey's injury in 2014.  (See Doc. 150 at 16).  Buchanan raised an authentication objection before trial, positing the passage of time and weather-related changes to the property rendered the 2017 photographs inaccurate as representations of the scene at the

---

[3] We note that Buchanan also references Federal Rule of Civil Procedure 60(b)(6) in its motion and brief, but does not elaborate on a basis for relief under that rule.  When a motion is filed within 28 days after entry of judgment, it must be considered under Rule 59(e), not Rule 60(b).  See CTC Imports & Exports v. Nigerian Petrol. Corp., 951 F.2d 573, 577 (3d Cir. 1991) (quoting Rankin v. Heckler, 761 F.2d 936, 942 (3d Cir. 1985)).

[4] Ramsey's opening brief styled his request as one "for additur as to pain and suffering damages" or, in the alternative, for a new trial.  (See Doc. 159 at 1).  In his reply brief, Ramsey acknowledges the constitutional prohibition against additur in federal court and clarifies he seeks only a new trial on pain-and-suffering damages. (See Doc. 162 at 1).

time of the incident.  (See 4/5/21 Tr. 4:14-6:1; see also Docs. 120, 123).[5]  The court compared the photographs taken in 2014 with those taken in 2017 and concluded there were no "material or significant change[s]," accepting Ramsey's counsel's proffer that witnesses would confirm the general conditions depicted in 2014 and 2017 were "substantially similar."  (See 4/5/21 Tr. 6:2-8:15).  The court thus allowed Ramsey to introduce the 2017 photographs, finding Buchanan's concerns went to weight, not admissibility.  (See id. at 6:19-8:10).  Buchanan now contends that the proffered witness testimony failed to properly authenticate the photographs.  (See Doc. 150 at 16).  We disagree.

Federal Rule of Evidence 901(a) requires the proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  See FED. R. EVID. 901(a).  Our court of appeals describes this burden as "slight."  See United States v. Turner, 718 F.3d 226, 232 (3d Cir. 2003).  The 2017 photographs easily cleared this low bar.  Multiple witnesses at trial confirmed the photographs depict the same general condition that Ramsey would have encountered on the night of his injury in 2014.  (See 4/5/21 Tr. 50:19-51:5, 53:23-57:12, 57:19-59:22; 4/6/21 Tr. 97:9-98:3, 145:10-146:16).  Although Robert Lehman, Buchanan's parts manager, qualified that there was more "gravel" around the asphalt depression in 2017 from deterioration over time, (see 4/6/21 Tr. 145:10-146:2), he nonetheless agreed the conditions in the 2017 photograph were "similar" to what Ramsey would have encountered in 2014, (see 4/6/21 Tr. 145:16-18).

_____

[5] Citations to the record include the official transcript of the jury trial ("[Date] Tr.") and the parties' trial exhibits ("Ramsey Ex." or "Buchanan Ex.").

All of this witness testimony confirms the photographs are what they purported to be—general depictions of the parking lot conditions in 2017. <u>See</u> FED. R. CIV. P. 901(a). To the extent there are minor variations between the 2014 and 2017 photographs, they were explained for the jury's consideration, including by Ramsey himself. (<u>See</u> 4/5/21 Tr. 51:1-5). This is simply not a case where we do not know who took the photographs, when they were taken, or exactly how the area had changed in the intervening time period. <u>Cf.</u> <u>Bosco v. United States</u>, 164 F. App'x 226, 231 (3d Cir. 2006) (nonprecedential). We reiterate our prior ruling that the 2017 photographs were properly authenticated and that the concerns raised by Ramsey's counsel go to weight, not admissibility. We therefore deny Buchanan's motion on this evidentiary issue.

**B.   Jury Instruction**

Buchanan contends that the court erred by failing to instruct the jury regarding "trivial defects." (<u>See</u> Doc. 150 at 25-28). On the morning of the charge conference, Buchanan submitted a proposed jury instruction asking the court to charge the jury that a trivial defect does not constitute a dangerous condition for purposes of premises liability. (<u>See</u> 4/7/21 Tr. 64:3-8). The court noted that the case invoked by Buchanan involved a minor deviation in a public sidewalk, whereas our case involved a business invitee at a commercial establishment. (<u>See</u> <u>id.</u> at 64:9-20 (referencing <u>Cline v. Statler</u>, 34 Pa. D. & C.4th 289 (Pa. Ct. Com. Pl. 1997))). We also noted that, to the extent Buchanan was worried the jury would not take the nature of the alleged defect into account, it was already required to do so under the court's instructions, which expressly advised the jury that Buchanan could only be found

liable for a defect which "involves an unreasonable risk of harm."  (See id. at 64:21-65:15; see also id. at 136:4-13).  We thus declined Buchanan's request for a trivial-defect instruction.

Buchanan's post-trial briefing fails to establish that the court erred as a matter of law in declining to provide the proposed instruction.  Buchanan has yet to identify a single case extending the trivial-defect concept from sidewalks and streets to commercial business parking lots.  (See Doc. 150 at 25-26 (citing Foster v. Borough of West View, 195 A. 82, 83 (Pa. 1937) (defective condition in borough sidewalk); Van Ormer v. City of Pittsburgh, 31 A.2d 503, 503-04 (Pa. 1943) (defective condition in city sidewalk); German v. McKeesport City, 8 A.2d 437, 440 (Pa. Super. Ct. 1939) (same); Bosack v. Pittsburgh Railways Co., 189 A.2d 877, 880-81 (Pa. 1963) (discussing concept of trivial defects as pertains to "a depression or an irregularity on a street or highway"))).[6]  The only reference to trivial defects in the *Pennsylvania Suggested Standard Civil Jury Instructions* appears in instructions concerning the duties owed by owners of land "abutting public sidewalks" to "pedestrians properly using [those] walks."  See PA. SUGGESTED STANDARD CIVIL JURY INSTRUCTION 18.80. The commentary to the suggested instruction cites a collection of cases, all of which also arose in the public sidewalk or street context.  See id. (citing German, 8 A.2d at

---

[6] The two decisions we have uncovered that do extend the trivial-defect concept to private business parking lots do not acknowledge that their decisions reflect an extension.  See, e.g., Fristic v. Maple Lawn Associates, Inc., 240 A.3d 162, 2020 WL 4728115, at *4-6 (Pa. Super. Ct. 2020) (table decision); Ford v. Red Robin Int'l, Inc., No. 1825 WDA 2014, 2015 WL 6666275, at *4 (Pa. Super. Ct. 2015) (nonprecedential).

440; <u>Bosack</u>, 189 A.2d at 880; <u>Alston v. Commonwealth</u>, 20 Pa. D. & C.5th 49 (Pa. Ct. Com. Pl. 2010) (sidewalk); <u>Dudley v. Feldman</u>, 30 Pa. D. & C.4th 97 (Pa. Ct. Com. Pl. 1996) (street)).

In any event, assuming *arguendo* the body of trivial-defect law does apply to this business-invitee case, we again reiterate that there is no error in declining to explicitly instruct the jury on trivial defects.  Our instructions already required the jury to consider the nature of the defect in making their liability assessment: the court instructed the jury, consistent with Pennsylvania law, that Buchanan could only be held liable for foreseeable conditions which result in "an unreasonable risk of harm."  (<u>See</u> 4/7/21 Tr. 64:21-65:15, 136:4-13); <u>see also</u> <u>Zimmerman v. One Adams Place, L.P.</u>, No. 1263 WDA 2019, 2020 WL 1174491, at *3 (Pa. Super. Ct. Mar. 11, 2020) (explaining a defect is "trivial" when "it does not involve an unreasonable risk of harm"); <u>Ford</u>, 2015 WL 6666275, at *4 (puddle "constituted a trivial defect" when there was insufficient evidence that it "presented an unreasonable risk of harm").  Buchanan has failed to establish that the court committed instructional error, much less error warranting a new trial.  We will deny Buchanan's motion on this ground as well.

### C.      Factual Cause

Buchanan next challenges as against the weight of the evidence the jury's liability finding, *viz.*, that Ramsey was comparatively negligent, but his negligence was not a factual cause of his injury.  (<u>See</u> Doc. 150 at 21-25).  Buchanan offered two theories of comparative negligence at trial—that Ramsey failed to exercise reasonable care by failing to maneuver the cage in a manner which allowed him

to see where he was going, and by failing to utilize a wooden ramp provided by Buchanan to assist drivers making deliveries.  (<u>See</u> <u>id.</u> at 21).  Buchanan posits that it is impossible to reconcile the jury's acceptance of one of these two theories with its conclusion that Ramsey's comparative negligence was not the factual cause of his injury.  (<u>See</u> <u>id.</u> at 22-25).

Buchanan's argument rests entirely on its view that had Ramsey either maneuvered the cart appropriately or utilized the ramp, his fall necessarily would not have happened.  We disagree.  As an initial matter, Buchanan presented no evidence to the jury of an alternative manner to move the cage which would have allowed Ramsey to see what was in front of it.  (<u>Cf.</u> 4/6/21 Tr. 139:1-141:2 (Lehman testimony about maneuvering cage limited to where to place hands and whether to push from narrow or wide side to avoid tipping)).  But even if the jury concluded Ramsey was comparatively negligent for "not looking where he was walking," (<u>cf.</u> Doc. 150 at 22), the jury could also have found the nature of the asphalt depression or a lack of adequate lighting meant Ramsey would not have noticed it even with reasonable diligence, (<u>see, e.g.,</u> 4/5/21 Tr. 60:2-4 (Ramsey testifying "it wasn't a well lit area at all"); 4/6/21 Tr. 85:21-87:1 (Buchanan's president struggling to make out depression in photograph at trial)).

Similarly, the jury could have credited Buchanan's theory that Ramsey should have known about and used the ramp, while at the same time accepting Ramsey's suggestion that the ramp would not have covered the depression that caused his accident.  Both findings would be supported by the evidence.  Ramsey claimed he did not know about the ramp, (<u>see</u> 4/5/21 Tr. 55:15-56:4), but Buchanan

established that Ramsey had made more than 20 deliveries to the property; that Buchanan advised all of its vendors about the ramp before providing them a key for overnight deliveries; and that other delivery drivers used the ramp and had no problems, (see id. at 102:4-11; 4/6/21 Tr. 67:14-68:14, 74:15-21, 127:23-129:7).  Thus, the jury could have found Ramsey ought to have known about and used the ramp. The jury just as easily could have found, however, that the ramp would not have solved the problem, since it was designed to cover a "lip" or "rise" at the threshold to the garage, (see 4/6/21 Tr. 64:9-65:23, 94:8-19, 126:11-129:1; see also Ramsey Ex. P-0005), and it was a depression in the asphalt, not the "lip" or "rise" at the threshold, that caused Ramsey's fall, (see 4/5/21 Tr. 52:2-53:5).  The jury saw a photograph in which the ramp was positioned as intended, (see Ramsey Ex. P-0005; 4/6/21 Tr. 94:8-19), and in that photograph, the ramp plainly does not cover the depression, (see Ramsey Ex. P-0005).

For these reasons, we reject Buchanan's claim that the verdict as to liability "is so disproportionate to the uncontested evidence as to defy common sense and logic."  (See Doc. at 150 at 23 (quoting Andrews v. Jackson, 800 A.2d 959, 962 (Pa. Super. Ct. 2002))).  To the contrary, there is ample evidence to support the jury's determination that comparative negligence on Ramsey's part was not the factual cause of his injury.  We will deny Buchanan's motion for a new trial on this ground.

### D.    Damages

Both parties take issue with the jury's assessment of damages.  Buchanan challenges the jury's award of damages for past and future wage loss, as well as its award of damages for medical expenses.  (See Doc. 150 at 5-15, 28-32).  Ramsey

argues the jury's award of pain-and-suffering damages is so contrary to the evidence as to require a new trial.  (See Doc. 159 at 11-13).  We begin our discussion with Buchanan's arguments regarding past and future wage loss.

Buchanan's request that the court reduce the jury's wage-loss award in this diversity action is governed by Pennsylvania law.  See Jester v. Hutt, 937 F.3d 233, 240 (3d Cir. 2019).  Under Pennsylvania law, judicial reduction (also known as remittitur) of a jury's damages award is appropriate only when the award "is plainly excessive and exorbitant."  See id. (quoting Zauflik v. Pennsbury Sch. Dist., 104 A.3d 1096, 1129 (Pa. 2014)).  To determine whether remittitur is appropriate, the court must ask whether the jury's award "falls within the uncertain limits of fair and reasonable compensation" or instead "so shocks the sense of justice as to suggest the jury was influenced by partiality, prejudice, mistake, or corruption."  See id. (quoting Zauflik, 104 A.3d at 1129).  In considering the separate question of whether the award is against the weight of the evidence and warrants a new trial, we ask whether the award so "cuts against the verdict" that "a miscarriage of justice would result if the verdict were to stand."  See Leonard, 834 F.3d at 386 (quoting Springer, 435 F.3d at 274).

The starting point for our analysis is the settled premise that the law does not require proof of compensatory damages with "mathematical exactness."  See Kaczkowski v. Bolubasz, 421 A.2d 1027, 1030 (Pa. 1980) (quoting Lach v. Fleth, 64 A.2d 821 (Pa. 1949)).  Rather, it requires only that damages "be supported by a reasonable basis for calculation."  See id. (quoting Stevenson v. Economy Bank of

Ambridge, 197 A.2d 721, 727 (Pa. 1964)).  Critically, however, a jury cannot premise

its damages award on "mere guess or speculation."  See id.

As a threshold matter, we reject Buchanan's argument that the jury's

lost-wages damages award is necessarily excessive or against the weight of the

evidence solely because it exceeds the amount of Ramsey's workers' compensation

lien for the same damages.  (See Doc. 150 at 7-9).  The stipulation read to the jury

was as follows:

> The parties in this case have agreed that certain
> stipulated facts are true, and the stipulated facts have
> been read to you during the trial.  Specifically this relates
> to the element of expenses paid on Mr. Ramsey's behalf
> by a third party, and the stipulated fact is as follows, that
> a third party paid benefits on Mr. Frank Ramsey's behalf
> as a result of the injuries he alleged he suffered in
> September of 2014, and the benefit included as follows.
>
> $28,376.18 for medical expenses; another payment of
> $6,482.98 for medical expenses; and $86,120.67 in
> indemnity payments for past and future lost wages for
> him which was received in September of 2015.  If you
> award damages, and my statement[] as to this stipulation
> is not in any way to be construed as any indication of
> mine that you should find damages in this case, but if you
> find damages in his favor[,] he is legally required to pay
> the third party who has paid the benefit in the amounts
> that I just identified.  Ladies and gentlemen, you must
> treat these stipulated facts as having been proved for the
> purposes of this case.

(See 4/7/21 Tr. 127:13-128:6).  There is no indication in the stipulation that the

$86,120.67 Ramsey received from his workers' compensation insurer represented

the entirety of his past and future lost wages, nor was the stipulation ever presented

to the court or to the jury as an agreed-upon cap on Ramsey's wage-loss claim.  Its

purpose was merely to alert the jury that Ramsey would have to repay to other third

parties the first $120,979.83 of any damages awarded to him.  (<u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 80:22-81:23; 4/5/21 Tr. 28:23-29:21).  Accordingly, the existence of the stipulation is not, by itself, a reason to reduce the lost-wages damages award or grant a new trial.

The stipulation did, however, influence the parties' assumptions and presentations at trial.  Both sides clearly assumed that if the jury were to award damages for past and future lost wages, the award would track the amount set forth in the stipulation.  As a result, beyond identifying the stipulated amounts, neither party addressed the amount of past and future lost wages to the jury.  Ramsey's counsel never argued that Ramsey suffered more past or future wage loss than contemplated by the stipulation.  Even in his pretrial memorandum, Ramsey's counsel limited his assessment of Ramsey's economic damages to "approximately $150,000.00," which figure included the $28,376.18 medical lien, $6,482.98 Medicare lien, $86,120.67 workers' compensation indemnity lien, and another $27,648.00 in lost wages for 2015 and 2016, the two years during which Ramsey was out of work following his injury.  (<u>See</u> Doc. 103 at 3-4).  There was no indication counsel believed or would argue at trial that Ramsey was entitled to lost wages beyond those discrete amounts.  (<u>See</u> <u>id.</u>)

Ramsey's counsel instead focused his damages presentation on plaintiffs' noneconomic harms.  (<u>See</u> 4/7/21 Tr. 81:24-85:2).  Counsel elicited testimony from Ramsey about the pain he continues to suffer, the treatments and surgeries he endured, how his daily activities have been affected, and the ways in which his mental health has suffered.  (<u>See, e.g.</u>, 4/5/21 Tr. 73:5-76:8, 79:11-80:8).  Ramsey also testified about the impact his injury and period of unemployment had on his family,

particularly his relationships with his wife and daughter, (see id. at 79:11-80:8, 86:20-88:1), and his wife and daughter confirmed not only that Ramsey continued to suffer physically and mentally, but that their relationships with him had been damaged as well, (see, e.g., 4/6/21 Tr. 17:6-18:16, 20:17-22:3, 26:14-27:16, 35:7-37:18, 38:3-39:12). Ramsey's counsel focused the damages component of his opening statement and closing argument on this evidence, underscoring to the jury the extent of Ramsey's pain and suffering, his embarrassment and humiliation, and his loss of enjoyment of life. (See 4/5/21 Tr. 27:2-28:14; 4/7/21 Tr. 81:24-85:2).

The net result of the parties' assumptions is an evidentiary record almost entirely devoid of evidence upon which the jury could reach its own wage-loss determination. The sum total of the evidence is as follows. Ramsey testified he was out of work for all of 2015 and 2016 due to his injury. (See 4/5/21 Tr. 76:18-77:16). He testified he had been working full time earning $19 per hour with TransForce, and time and a half for overtime, until his injury put him out of work. (See id. at 77:17-24).[7] The jury received an exhibit confirming Ramsey earned $0 in Social Security taxed earnings in 2015 and 2016. (See Ramsey Ex. P-0737). Although neither party drew the jury's attention to other figures, the exhibit also reflects Social Security taxed earnings of $10,773 for 2013 and $16,875 for 2014 and total

---

[7] There is some ambiguity in the record with respect to whether Ramsey was making $19 per hour at TransForce or $16 per hour. Ramsey testified on direct examination that he made $19 per hour while at TransForce, (see 4/5/21 Tr. 77:17-24), but on cross-examination, he agreed with Buchanan's counsel it was actually "$16 an hour . . . there, but it was nineteen when we, when I went over to the other job it was nineteen," (see id. at 105:17-22). For purposes of the instant motions, we resolve this ambiguity in favor of Ramsey.

lifetime earnings for Ramsey, for his 50 years of work preceding 2014, of $432,887. (<u>See</u> <u>id.</u>)

Ramsey also testified he was able to return to work by 2017, first as a truck driver with Synergy, then driving a "mini bus" at Virginia Transit Company for a year and a half before leaving to work as a student shuttle driver at George Mason University. (<u>See</u> <u>id.</u> at 80:9-16, 83:3-86:10). Ramsey explained he was unable to keep the first job at Synergy because of two accidents resulting from his residual wrist limitations, but there is no indication in the record if or for how long Ramsey was unemployed before he secured employment with Virginia Transit Company. (<u>See</u> <u>id.</u>) Ramsey testified he made $12 per hour at Virginia Transit Company and $15 per hour at George Mason University; he did not identify his hourly wage while at Synergy, nor how many hours he worked or whether he received overtime in any of these jobs. (<u>See</u> <u>id.</u> at 86:8-15). The Social Security taxed earnings statement reflects income of $11,546 in 2017 but does not include years 2018, 2019, or 2020. (<u>See</u> Ramsey Ex. P-0737). Finally, Ramsey testified he was laid off by George Mason University because of the COVID-19 pandemic but would return to work as soon as pandemic restrictions lifted. (<u>See</u> 4/5/21 Tr. at 86:16-19). Indeed, a recurring theme of Ramsey's testimony was that he intends to return to work and, in fact, wants to work for as long as possible. (<u>See, e.g.,</u> <u>id.</u> at 65:12-66:6, 76:3-8, 85:8-10, 86:16-19, 130:21-131:1).

Against this backdrop, we must determine whether the jury's effective past and future wage loss award of $350,000—$436,120.67 less the $86,120.67 Ramsey was required to repay to his workers' compensation insurer—is against the weight of the

16

evidence.  We are constrained to conclude that it is.  To be sure, the jurors had *some*
information about Ramsey's past lost earnings.  If they reviewed the entire Social
Security earnings statement, and not just the two years Ramsey's counsel called to
their attention, they could have gleaned Ramsey earned $16,875 through September
2014; from there, they might have found Ramsey could have made the same in 2015
and 2016, had he not been out of work due to his injury, for past lost wages for those
years of approximately $45,000.[8]  Perhaps they also found Ramsey's lost wages for
2017 were approximately $10,954, representing his 2014 baseline earnings less his
earnings at his new job in 2017.  Of course, all of this assumes the jury dug through
and parsed the record evidence to make findings Ramsey's counsel did not ask of
them.  But after that, the jury was left to guesswork.  They knew only how much
Ramsey made per hour at two of his three jobs between 2018 and early 2020, but
received no evidence about how many hours he worked at those jobs, whether
he received overtime pay, or how long he was employed at each job.  Absent any
reasonable basis for a calculation, the jury's wage-loss award for these years could

---

[8] Ramsey's counsel contends the $16,875 figure for 2014 is misrepresentative
because Ramsey stopped working after his injury in September of that year.  (See
Doc. 158 at 7).  Ramsey never specified when exactly he stopped working after his
injury, and his testimony suggests that he continued to work for at least some time
afterward.  (See, e.g., 4/5/21 Tr. 65:17-66:6 (describing fear that "they were going to
take me off the job" when asked about misrepresentation regarding source of injury
made to medical provider one week after incident)).  Tellingly, Ramsey's counsel
himself utilized the unadjusted $16,875 figure in calculating Ramsey's "baseline"
annual earnings in his pretrial memorandum.  (See Doc. 103 at 3-4).  This further
illustrates the lack of reliable, objective evidence on which the jury could base a
damages calculation.  Nonetheless, for purposes of the instant motions, we accept
Ramsey's assertion that, had he kept earning through the remainder of 2014, he
would have earned $22,500 over the course of the full year.  (See Doc. 158 at 7).

only have been the result of "guess or speculation." See Kaczkowski, 421 A.2d at 1030 (quoting Stevenson, 197 A.2d at 727).

More problematic is the lack of any evidentiary basis in the record for the jury's future wage-loss calculation. Subtracting the estimated 2015, 2016, and 2017 past lost wages from the $350,000 award would leave a wage-loss balance of $294,046. Presumably some small part of that figure represents past lost wages for the years 2018, 2019, and early 2020—the difference between what the jury found Ramsey earned, and found he should have earned, during those years—as well as through the time of trial. But the greater balance of the jury's remaining wage-loss award necessarily had to have been assigned to future lost wages, and it seems to assume Ramsey does not return to work in any capacity for the remainder of his 13-year life expectancy. The problem is that Ramsey himself rebutted any such finding, insisting he wants to return to work once pandemic-related restrictions end and intends to work for the remainder of his life. Beyond this testimony, the jury heard no evidence whatsoever about Ramsey's future lost-earning capacity, nor did they hear evidence which would support a finding that Ramsey would never secure new employment. Cf. Keifer v. Reinhart Foodservices, LLC, 563 F. App'x 112, 116 (3d Cir. 2014) (nonprecedential) (jury's future lost-wages calculation supported by plaintiff's testimony he accelerated retirement by five years due to injury). Indeed, the evidence was to the contrary—Ramsey *did* obtain new employment after his injury, his layoff due to the pandemic had nothing to do with his injury, and he expressed a full intention to return to work.

Given the veritable dearth of evidence presented to the jury on the issue of Ramsey's past and future lost earnings, we cannot but conclude that the jury's award of $350,000 is against the weight of the evidence.  The award simply cannot be reconciled with the sparse evidence of damages actually presented at trial.  To be clear, this is not to minimize Ramsey's past and future lost earnings or the consequences of the injury he suffered.  We hold only that the verdict, given the record developed by the parties, is "substantially larger than that which the evidence presented at trial could sustain."  See Jester, 937 F.3d at 240.

Having reviewed the trial record, our assessment of the verdict is that the jury may have been confused regarding damages.  The jury did raise two questions on the subject—the first to confirm the total amount Ramsey must repay, and the second about the verdict form itself, specifically whether "the *sum* of these three lines represent what will actually be awarded to Mr. Ramsey?"  (See 4/8/21 Tr. 4:11-16, 5:22-6:4).  We also find it curious that, on the issue of medical expenses, neither party argued to the jury that actual damages exceeded the lien amount, and the jury did what the parties expected—it matched the amount of the stipulated medical liens.  (See 4/7/21 Tr. 127::21-22; Doc. 133 at 3).[9]  But for lost wages, as to which there likewise was no argument that the verdict should exceed the stipulated lien amount, the jury awarded a lump sum figure of $350,000—more than four times the amount of the corresponding lien.  (See 4/7/21 Tr. 127:22-23; Doc. 133 at 3).  We are inclined

---

[9] The jury's award varied from the stipulated lien amount by just two cents, which we presume was a mathematical error.

to agree with Buchanan that this lump-sum figure looks more like an award for pain-and-suffering damages.  (<u>See</u> Doc. 150 at 13).  Indeed, the amount awarded falls squarely within the "$250,000.00 to $350,000.00" valuation range for pain and suffering that plaintiffs' counsel attached to plaintiffs' claims in their pretrial memorandum.  (<u>See</u> Doc. 103 at 4).  Candidly, the court believes the jury simply made a mistake when filling out the verdict form—incorrectly adding pain-and-suffering damages to the wage-loss calculation—and limited its calculation of $50,000 in pain-and-suffering damages as reflected on the verdict form to future pain and suffering.

Nonetheless, we cannot know what was in the jury's mind.  What we do know is that Ramsey's counsel focused his damages evidence and argument almost exclusively on Ramsey's noneconomic injuries, that there was virtually no evidence introduced from which the jury could calculate Ramsey's past and future wage loss beyond the stipulated amount of the workers' compensation lien, and that the jury nonetheless returned an award for past and future wage loss in an amount which quadrupled that lien.  Under the circumstances, and given our assessment that juror confusion may have contributed to the damages aspect of this verdict, we are

constrained to conclude that a new trial on all aspects of damages is warranted.[10]

See Vizzini, 569 F.2d at 759.

IV.   **Conclusion**

We will deny Buchanan's post-trial motions as to liability, but will grant the motion to the extent it seeks a new trial on damages.  We will also deny Ramsey's post-trial motions as moot.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 7, 2022

---

[10] Because we will grant a new trial on the damages component of this case, we need not address Buchanan's argument for judgment as a matter of law or for remittitur of the medical expenses award or Ramsey's arguments for a new trial on pain-and-suffering damages.  We will also deny without prejudice Ramsey's motion for delay damages.